**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-6490**

───────────

MANDRIEZ SPIVEY,

       Plaintiff - Appellant,

     v.

MICHAEL BRECKON, Warden of USP Lee; JAMES PHELPS, Captain, USP Lee,
JAMES BOWLES, Lieutenant, USP Lee; PHILLIP MULLINS; WILLIAM
CANTRELL; NANCY SMITH; WANDA MCINTYRE; KAREN PEASE;
THOMAS KIRBY; JESSICA BABNEW; LAUREN BAILEY; TANYA CUNIC,
MARK MOORE,

       Defendants - Appellees.

───────────

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke.  Michael F. Urbanski, Senior District Judge.  (7:20-cv-00400-MFU-JCH)

───────────

Argued:  December 12, 2025                       Decided:  April 20, 2026

───────────

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge
Gregory and Judge Agee joined.

───────────

**ARGUED:**   Wynne Muscatine Graham, ALL RISE TRIAL & APPELLATE,
Philadelphia, Pennsylvania, for Appellant.  Laura Taylor, OFFICE OF THE UNITED
STATES ATTORNEY, Roanoke, Virginia, for Appellees.  **ON BRIEF:** Samuel Weiss,
D. Dangaran, RIGHTS BEHIND BARS, Washington, D.C.; Devi M. Rao, RODERICK &

SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Appellant. Zachary T. Lee, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellees.

NIEMEYER, Circuit Judge:

Mandriez Spivey, a former federal inmate, commenced this *Bivens* action[*] against federal employees of the Bureau of Prisons, alleging that they provided him with delayed or inadequate medical treatment and used excessive force against him during his incarceration. He maintained that the defendants' conduct violated the Eighth Amendment (prohibiting cruel and unusual punishments) and, alternatively, the Fourth Amendment (prohibiting seizures that apply excessive force). For relief, he sought $10 million in compensatory damages and $5 million in punitive damages.

The district court granted the defendants' motion to dismiss Spivey's complaint, concluding that "a *Bivens* remedy [was] unavailable" for the plaintiff's claims. For the reasons that follow, we affirm.

I

Spivey, a federal inmate at USP Lee in Pennington Gap, Virginia, during the period between December 2017 and October 2018, commenced this action against 13 prison officials for damages, relying on *Bivens* and its progeny. In his third amended complaint, he alleged that when he arrived at USP Lee, he was suffering from a tooth cavity and tooth inflammation. A prison official advised Spivey that USP Lee did not have a staff dentist but that she would place him on the waitlist for dental care. He did not receive that care, however, until he was transferred to a new facility.

---

[*] *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Spivey also alleged that while at USP Lee, a tooth broke, resulting in part of it falling out, and that he removed the remainder of the tooth himself, which caused pain. He did not allege, however, that he sought medical care for this tooth.

In addition to his dental issues, Spivey alleged that he experienced bleeding from the rectum and reported the issue to a prison official, who then administered a feces test, presumably to determine whether the bleeding was internal. After the test, as he alleged, he was provided no further treatment.

Finally, Spivey alleged that he suffered from depression and requested mental health care through participation in a prerelease psychology class, but his request for enrollment in the class was denied, purportedly because there was an outstanding detainer against him.

In addition to alleging inadequate medical care, Spivey also alleged that prison officials used excessive force when investigating torn towels or sheets in his cell, which he shared with another inmate. Despite the fact that Spivey's cellmate admitted to doing the tearing, the officials placed Spivey in restraints, which, he alleged, fitted too tightly, causing the restraints to cut into his wrists, ankles, and sides, and resulted in swelling. The officials also pressed a shield into Spivey's back, ankles, and calves and slammed his head into the wall. Spivey alleged that he suffered severe pain, discomfort, and scarring to his wrists, ankles, and sides and also severe pain and discomfort to his neck, back, calves, Achilles tendon, feet, and toes. Officials denied Spivey medical treatment for the pain. As a result of this force, Spivey alleged that he suffered emotional and mental distress.

4

Based on these factual allegations, Spivey alleged that prison officials violated his rights under the Fourth, Fifth, and Eighth Amendments and demanded that he be awarded $15 million dollars in compensatory and punitive damages.

The district court granted the defendants' motion to dismiss, ruling that a *Bivens* remedy was not available to Spivey. The court explained that Spivey's claim presented a new context beyond those previously recognized by the Supreme Court and that special factors counseled against extending an inferred damages remedy under the Constitution.

From the district court's judgment dated March 18, 2024, Spivey filed this appeal.

## II

On appeal, Spivey contends that his inadequate medical claims are authorized by *Carlson v. Green*, 446 U.S. 14 (1980) (holding that a *Bivens* remedy was available under the Eighth Amendment for the failure to provide adequate medical treatment), and that his excessive-force claims are authorized by our recent decision in *Fields v. Federal Bureau of Prisons*, 109 F.4th 264 (4th Cir. 2024) (extending a *Bivens* remedy to an excessive-force claim under the Eighth Amendment). Therefore, he argues, the district court erred in dismissing his claims.

## III

In *Bivens*, the Supreme Court created a cause of action for damages against federal officials who allegedly violated the plaintiff's Fourth Amendment's right to be free from unreasonable searches and seizures. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971). And following *Bivens*, the Court in *Davis*

*v. Passman* created a *Bivens* cause of action against a Congressman alleged to have discriminated against a woman on the basis of sex, in violation of her Fifth Amendment rights. 442 U.S. 228 (1979). And finally in *Carlson*, the Court created a *Bivens* cause of action against federal prison officials alleged to have failed to treat adequately a prisoner's asthma, in violation of the Eighth Amendment. 446 U.S. at 14, 16 n.1.

These three cases, decided in the decade from 1970 to 1980 — "during [an] *ancien regime*" when the Court "followed a different approach to recognizing implied causes of action" by assuming common-law powers to create them, *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017) (cleaned up) — are the only instances in which the Court has authorized a damages action under the Constitution itself. And since then, it has attempted to close the door on all such further actions, explaining that it has, since the *Bivens* decade, "come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (cleaned up). Indeed, the Court has recognized that "the Judiciary's authority to do so at all is, at best, uncertain," concluding that now "recognizing a cause of action under *Bivens* is a disfavored judicial activity" because "creating a cause of action is a legislative endeavor." *Id.* (cleaned up).

From the beginning, Justices of the Supreme Court have expressed a separation-of-powers concern. *See Bivens*, 403 U.S. at 411–12 (Burger, C.J., dissenting) (warning that the decision threatened "the important values of the doctrine of separation of powers," as "[l]egislation is the business of Congress"); *id.* at 429 (Black, J., dissenting) (noting that the *Bivens* decision violated core principles of the separation of powers and that the "task

6

of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures of the States," *not* the judiciary); *id.* at 430 (Blackmun, J., dissenting); *Carlson*, 446 U.S. at 32, 34 (Rehnquist, J., dissenting) (lamenting that the Court took a "wrong turn" in *Bivens* and emphasizing that the "creation of such remedies is a task that is more appropriately viewed as falling within the legislative sphere of authority"). More recently, Justice Gorsuch stated, "We should exercise the truer modesty of ceding an ill-gotten gain, and forthrightly return the power to create new causes of action to the people's representatives in Congress." *Egbert*, 596 U.S. at 504 (Gorsuch, J., concurring in the judgment) (cleaned up). Similarly, Justice Thomas has stated, "It is time to correct this Court's error and abandon the [*Bivens*] doctrine altogether." *Hernandez v. Mesa*, 589 U.S. 93, 118 (2020) (Thomas, J., concurring). And more generally, the Court itself has noted that we are "[n]ow long past 'the heady days in which [courts] assumed common-law powers to create causes of action.'" *Egbert*, 569 U.S. at 491 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring)). Indeed, the Court has even acknowledged that "if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Id.* at 502.

We have attempted to faithfully convey the Supreme Court's message about *Bivens* claims, repeatedly pointing out that they appear to be all but dead, albeit not yet dead. *See, e.g.*, *Orellana v. Godec*, 145 F.4th 516 (4th Cir. 2025); *Mays v. Smith*, 70 F.4th 198 (4th Cir. 2023); *Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023); *Dyer v. Smith*, 56 F.4th 271 (4th Cir. 2022); *Tate v. Harmon*, 54 F.4th 839 (4th Cir. 2022); *Annappareddy v. Pascale*,

996 F.3d 120 (4th Cir. 2021); *Earle v. Shreves*, 990 F.3d 774 (4th Cir. 2021); *Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019).

Yet, despite reservations expressed from the beginning in the *Bivens* cases' dissents, and thereafter by members of the Court in the many cases since *Bivens*, the Court has not overruled the three original *Bivens* cases and has left open the possibility of recognizing another *Bivens* action for the most extraordinary circumstances — when a court could conclude that in the circumstances before it, it should "arrogate legislative power" to provide a damages remedy for violation of the Constitution. *Egbert*, 596 U.S. at 491–92 (cleaned up).

"To inform a court's analysis of a proposed *Bivens* claim," the Supreme Court has set forth a two-step inquiry:

> First, we ask whether the case presents a new *Bivens* context — *i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action. Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy.

*Egbert*, 596 U.S. at 492 (cleaned up). And if a court cannot predict the system-wide consequences of recognizing a new *Bivens* remedy — which the Supreme Court says is "likely" — "that uncertainty alone is a special factor that foreclosures relief [with a *Bivens* action]." *Id.* at 493.

Because a court faced with a new *Bivens* claim will virtually always recognize (1) that the consequences of granting a *Bivens* remedy will be uncertain and (2) it is more

rational and fitting under the Constitution's separation of powers to defer to Congress on whether to grant a damages remedy for violation of the Constitution, it is difficult to conceive of when a new *Bivens* claim could be recognized. Indeed, it might be appropriate to understand *Bivens* claims today as analogous to the *Lemon* test (a test for Establishment Clause violations), which Justice Scalia observed was "[l]ike some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffled abroad, after being repeatedly killed and buried." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment). While the Supreme Court did thereafter abandon the *Lemon* test, *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–36 (2022), we, as lower court judges, must await the Supreme Court's ultimate verdict on *Bivens*. *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing viability").

IV

Spivey's most substantial argument is that his Eighth Amendment claims for inadequate medical treatment are *Bivens* claims explicitly authorized by *Carlson*.

While *Carlson* did authorize a *Bivens* claim for inadequate medical treatment in violation of the Eighth Amendment, the medical treatment of the inmate there was egregious. The inmate's estate alleged that prison officials kept the inmate, who suffered from asthma, in a certain facility against the advice of doctors, failed to provide attention for eight hours after an asthma attack, administered drugs that were contraindicated and

worsened the attack, used a respirator that was known to be inoperative, and delayed the inmate's transfer to the hospital, all of which led to the inmate's death. *Carlson*, 446 U.S. at 16 n.1.

Thus, the first question is whether Spivey's *Bivens* claims, premised on inadequate medical treatment, are presented in the same context as *Carlson*. If so, his claims may proceed. But if the context is meaningfully different from *Carlson*, we then proceed with the second step to consider whether "special factors indicat[e] that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 492 (cleaned up).

In determining whether Spivey's inadequate medical treatment claims provide a materially different context from the inadequate medical treatment claim in *Carlson*, we must take *Carlson* in its "precise context," as "even claims challenging the adequacy of medical care may . . . still present different contexts." *Bulger*, 62 F.4th at 138 (cleaned up). "[W]e do not consider context at a superficially high level of generality" but "must focus instead on the details." *Orellana*, 145 F.4th at 523.

Applying this standard, we have little difficulty in recognizing that Spivey's claims for inadequate medical treatment present a materially different context than the inadequate medical treatment claim presented in *Carlson*. The claims are different in kind, severity, and results.

Spivey alleged a temporary tooth condition — decay and inflammation — the treatment for which was delayed for lack of staff but which was ultimately provided. He also alleged rectal bleeding, which was investigated with a medical test, the result of which

was that no further treatment was provided. And the rejection of his request for participation in a psychology class to address depression may not even be a medical issue, but an educational one. Nonetheless, none of Spivey's claims were even close to the severity of those in *Carlson*. In *Carlson*, medical treatment recommended by doctors was rejected and improper medicine was administered. 446 U.S. at 16 n.1. This, coupled with long periods of delay, led to the death of the inmate. *Id.*

Also, when considering the policy implications, Spivey's claims are materially different. While the allegations in *Carlson* involved the deliberate indifference of prison officials to an inmate's health and their discrete acts of malfeasance — acting against the advice of doctors and providing fatally inadequate treatment for asthma — Spivey's allegations implicate broader systemic issues, such as USP Lee's staffing levels for dental care, treatment care for abdominal and digestive issues, and inmate eligibility for prerelease psychology classes. Spivey's inadequate medical treatment claims thus rest on a dissatisfaction with the prison system's institutional decisions regarding the proper treatment of particular medical conditions, not the types of deliberate malfeasance that provided the basis for the plaintiff's claims in *Carlson*. And, importantly, these systemic concerns relate directly to the prison system's institutional management of medical care, a domain that Congress has statutorily assigned to the Executive. *See* 18 U.S.C. § 3621(i)(1) ("the Bureau of Prisons should ensure that each prisoner . . . has access to necessary medical care, mental health care, and medicine"). We have held that such claims implicating organizational policies, administrative decisions, and economic concerns

11

"exceed the bounds of liability the Court's previous *Bivens* actions established." *Bulger*, 62 F.4th at 138.

Finally, we conclude that the district court aptly noted that Congress enacted the Prison Litigation Reform Act (PLRA) approximately 15 years after *Carlson* was decided and that that Act "was designed to limit litigation brought by prisoners and remove the federal district courts from the business of supervising the day-to-day operations of prisons." (Quoting *Bulger*, 64 F.4th at 141); *see also* 42 U.S.C. § 1997e. Similarly, we have previously observed that "Congress has frequently legislated in the area of prisoner litigation, most notably with the [PLRA], but has so far declined to create an individual-capacity damages remedy for federal inmates." *Mays*, 70 F.4th at 206. The failure of the PLRA to provide for a "standalone damages remedy against federal jailers [is] a silence that speaks volumes and counsels strongly against judicial usurpation of the legislative function to create one." *Id*. (cleaned up). As such, Congress's "conspicuous[] silen[ce] about creating a remedy for prisoners to obtain damages from individual officers" in the aftermath of *Carlson*, along with an "expressed legislative desire to prevent courts from interfering with [Bureau of Prison] decisions," implicate separation-of-powers considerations that also render Spivey's claims a new context. *Bulger,* 62 F.4th at 141.

We thus conclude that more than one meaningful difference exists. Yet "a new context may arise if *even one* distinguishing fact has the potential to implicate separation-of-powers considerations." *Tate*, 54 F.4th at 846 (citing *Egbert*, 596 U.S. at 496). And we have emphasized that this is "a low bar because even 'quite minor' differences between a proposed claim and the claims in the three existing *Bivens* cases can amount to a new

12

context." *Mays*, 70 F.4th at 203. Here, Spivey's claims of inadequate medical treatment easily clear that low bar of distinction and thus constitute a new context.

Because Spivey's inadequate medical treatment claims arise from a context distinct from *Carlson*, we must move on to the second step of the *Bivens* analysis and determine whether "there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 492 (cleaned up).

Here, inmates in Spivey's condition have access to such alternative remedies, including injunctive relief in the Bureau of Prison's Administrative Remedy Program. *See* 28 C.F.R. § 542.10. Federal inmates can seek formal review of "any aspect" of their confinement through the Administrative Remedy Program. *Id.* § 542.10(a); *see also Malesko*, 534 U.S. at 74 ("BOP's Administrative Remedy Program . . . provides yet another means through which allegedly unconstitutional actions and policies can be . . . prevented from recurring"). The Supreme Court has made clear that "whether a given remedy is adequate is a legislative determination" and that "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second guess that calibration by superimposing a *Bivens* remedy." *Egbert*, 596 U.S. at 498. Congress's provision of alternative remedies for prisoners in Spivey's position thus counsels against extending a *Bivens* remedy to his claims.

Spivey argues nonetheless that although alternative remedies may be available generally, prison officials had foiled his efforts to access those remedies. But such an

13

argument fails to address the appropriate question.  In *Mays*, we noted that the "potential unavailability of a remedy in *a particular circumstance* does not warrant supplementing that scheme."  70 F.4th at 205–06 (emphasis added) (quoting *Bulger*, 62 F.4th at 141).  And in *Egbert*, the Supreme Court itself instructed that "a court should not inquire . . . whether *Bivens* relief is appropriate in light of the balance of circumstances in the particular case."  596 U.S. at 496 (cleaned up).  Rather, a court "will impair governmental interests, and thereby frustrate Congress's policymaking role, if it applies the special factors' analysis at such a narrow level of generality."  *Id.* (cleaned up).  In short, there are valid reasons to believe that "Congress is better suited to provide a cause of action" in these circumstances and that "judicial intrusion into [the Bureau of Prisons' general management of prison medical care] might be harmful or inappropriate."  *Orellana*, 145 F.4th at 523 (cleaned up).

At bottom, we conclude that Spivey's medical claims are made in a new context, distinct from the claims presented in *Carlson*, and special factors counsel against extending the *Bivens* remedy to address Spivey's circumstances.  Accordingly, a *Bivens* remedy is unavailable for Spivey's Eighth Amendment claims for inadequate medical care of the kind, severity, and result alleged in his complaint.

V

Spivey argues that "even if [his] medical claims were distinguishable from *Carlson*," his excessive force claims are authorized under our recent decision in *Fields v. Federal Bureau of Prisons*, 109 F.4th 264 (4th Cir. 2024), where we found a new *Bivens* cause of action to be available "for substantially similar excessive force claims."

14

This argument, however, is a non-starter. Following Spivey's briefing, the Supreme Court reversed our decision in *Fields*, and its decision squarely forecloses Spivey's argument. *See Goldey v. Fields*, 606 U.S. 942, 944 (2025) (per curiam). In *Goldey*, the Court held that Eighth Amendment excessive force violations constitute a new context and that special factors counsel against recognizing them as the basis for an implied *Bivens* cause of action. *Id.* Specifically, the Court explained that Congress has actively legislated in the area of prison litigation but has not enacted a statutory cause of action for money damages in that context; that extending *Bivens* could have negative systemic consequences on the ability of prison officials to manage prisons; and that aggrieved federal prisoners generally have access to alternative remedies. *Id.* at 944–45.

These conclusions apply with equal force to Spivey's excessive force claims, and accordingly we conclude that they are not available under *Bivens* and its progeny.

*     *     *

Despite enacting 42 U.S.C. § 1983, which allows *state* inmates to bring damage actions *against state officials* for violations of the Constitution, Congress has chosen not to authorize similar claims by *federal* inmates *against federal officials*. This apparent discrepancy is well recognized and indeed lamented by many. But Congress has had several opportunities to address it and has elected not to create such actions. Regardless of how the Judiciary regards this circumstance, it does not fall within the Judiciary's role to address it. "At bottom, creating a cause of action is a legislative endeavor," committed to Congress. *Egbert*, 596 U.S. at 491.

The judgment of the district court is accordingly affirmed.

AFFIRMED